UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HOSPITAL FOR SPECIAL SURGERY
535 East 70th St.
New York, NY 10021

                    *Plaintiff*,                    Civil Action No.:

          v.

XAVIER BECERRA, *in his official
capacity as Secretary of the United Stated
Department of Health and Human Services*
200 Independence Avenue, SW
Washington, DC 20201

CAROLE JOHNSON, *in her official
capacity as Administrator of the Health
Resources and Services Administration*
5600 Fishers Lane
Rockville, MD 20857

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES
200 Independence Avenue, SW
Washington, DC 20201

                    *Defendants*.

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff, Hospital for Special Surgery, a non-profit 501(c)(3) organization, by and through

its counsel, states and alleges as follows:

### JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because

this action arises under federal law. Hospital for Special Surgery asserts civil claims arising under

the Constitution and laws of the United States, including the Administrative Procedures Act, 5

U.S.C. § 701 et seq. (the "APA").

2.     The allegations of the Complaint give rise to an actual controversy within the meaning of 28 U.S.C. § 2201 and this Court has authority to grant the requested relief in this case under the APA, 5 U.S.C. § 706.

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because this lawsuit names an officer and agency of the United States and a substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

4.     Hospital for Special Surgery is a tax-exempt 501(c)(3) organization located in New York, NY, and was founded in 1863 as the New York Society for the Relief of the Ruptured and Crippled. It is the oldest orthopedic hospital in the United States, and is the country's leading academic medical center focused on musculoskeletal health. It is a specialty hospital devoted to orthopedic and rheumatology surgeries and treatments.

5.     Defendants the United States Department of Health and Human Services ("HHS"), along with Xavier Becerra ("Secretary Becerra") and Carole Johnson ("Administrator Johnson"), who have been sued in their official capacities as the Secretary of HHS and HRSA Administrator, respectively, were tasked with distributing funds to hospitals and other health care providers pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").

I.     **BACKGROUND**

    A.     **THE CARES ACT AND CREATION OF THE PROVIDER RELIEF FUND**

6.     Congress appropriated certain funds under the CARES Act for the purpose of providing financial relief to hospitals and other health care providers that suffered revenue losses, or increased expenses, due to the pandemic. Congress designated these funds as emergency appropriations, and they remain available until they are expended.

7.     This program became known as the Provider Relief Fund ("PRF"), and Congress funded it through initial and subsequent appropriations totaling $178 billion.

8.     HHS and the predecessor to Secretary Becerra, in turn, assigned responsibility for distributing PRF funds to the Health Resources and Services Administration ("HRSA"), a sub-agency of HHS. The current Administrator of HRSA is Carole Johnson.

9.     HRSA developed the methodology to distribute these funds, in various funding streams, from mid-2020 to the present. HRSA developed the methodology without notice and comment or any other formal public input, and explained to health care providers how it would allocate these funds through agency guidance, "FAQ's," and its website.

10.     HRSA has not made publicly available current and accurate information about the amount of remaining funds in the $178 billion PRF. According to a Congressional Research Services Report last updated on April 7, 2022, referenced in Paragraph 34 below, HRSA had allocated to providers $81.2 billion in General Distributions and $55.58 in Targeted Distributions, plus had allocated approximately $33 billion for fund administration, vaccines and therapeutics, and uninsured care costs. Additional unknown amounts may now be expended, or allocated or not expended, or committed by contractual obligations (e.g. administration), or reserved by HRSA for specific purposes, or subject to return by providers.

B.     **HOSPITAL FOR SPECIAL SURGERY AND ITS RESPONSE TO THE PANDEMIC**

11.     Hospital for Special Surgery is the world's leading academic medical center focused on musculoskeletal health, and is consistently rated the nation's top orthopedic hospital. Hospital for Special Surgery is an affiliate of Weill Cornell Medical College, and has a main campus in New York City and facilities in New Jersey, Connecticut and in the Long Island and Westchester County regions of New York State, as well as in Florida. In 2019, pre-pandemic,

Hospital for Special Surgery treated patients through 522,000 outpatient visits and 35,000 surgeries. As a single specialty hospital devoted to the surgical treatment of orthopedic conditions and other treatments for rheumatology patients, Hospital for Special Surgery does not treat general medical-surgical patients, and does not have an emergency room or a morgue.

12.     At the onset of the COVID-19 pandemic, Hospital for Special Surgery responded to the public health emergency by voluntarily shutting down its performance of elective orthopedic surgeries, which accounted for 92% of its patient revenue.  It did so in the interest of supporting and treating the dire health care needs of New York City-area residents ill with COVID-19, as well as those with other diseases or acute health situations outside of Hospital for Special Surgery's musculoskeletal specialty, and the hospitals treating these patients.

13.     Faced with a once-in-a-century pandemic, Hospital for Special Surgery transformed itself into a facility that treated COVID-19 patients, as well as some non-COVID-19 patients to relieve overflow from other hospitals so that those other hospitals could treat COVID-19 patients. Hospital for Special Surgery converted operating rooms into Intensive Care Units, anesthesia machines into ventilators, and re-directed its highly specialized orthopedic surgeons, nurses, and anesthesiologists to care for these patients with the same level of excellence they use for treating patients within their specialty. This transformation was for the benefit of the New York community and public health generally.

14.     In early March 2020, Hospital for Special Surgery formed a COVID-19 Leadership Team to manage the constantly changing needs of hospital operations, with cross-functional, foundational, and executive leaders across all departments and operations, which met seven days a week to identify, triage, and address real-time needs of clinicians, staff, and patients, with the goal of protecting staff and patients, serving the community, and saving lives.

15.     On Sunday, March 15, 2020, Hospital for Special Surgery leadership made the decision to cancel all nonessential care as of Tuesday, March 17, 2020, in order to use its resources and its medical staff to serve its community and respond to an unprecedented health crisis. Hospital for Special Surgery took this step earlier than any other hospital in New York City and ahead of the New York State or federal mandates.

16.     On March 23, 2020, the Governor of New York issued Executive Order 202.10, which directed that hospitals increase bed capacity for COVID-19 patients, and ordered, through the Commissioner of Health, that all general hospitals, ambulatory surgery centers, office-based surgery practices, and diagnostic and treatment centers "cancel[ ] all elective surgeries and procedures." Hospitals were ordered to comply by submitting COVID-19 plans to the New York State Department of Health. Exec. Order No. 202.10 (Mar. 23, 2020).

17.     At that time, Hospital for Special Surgery expanded its capacity to accept non-COVID patients from neighboring hospital systems, which was the best way to immediately increase the number of hospital beds available to treat COVID-19 patients, as ordered by Executive Order 202.10.

18.     In the final days of March 2020, it became clear to Hospital for Special Surgery that the public health crisis was going to get much worse, as the number of COVID-19 patients in New York City was dramatically increasing, with about one-quarter of all COVID-19 patients nationwide located in New York.

19.     In response, on March 30, 2020, at 8 a.m., Hospital for Special Surgery decided to evolve its surge plan to provide care for COVID-19 patients starting April 1, 2020.

20.     To accomplish this, almost overnight, Hospital for Special Surgery transformed its 9th floor Operating Room Suite into a ventilator-capable critical care unit, and transformed its 8th

and 10th floors into general medical floors to prepare for critical care and ventilated patients. Hospital for Special Surgery quickly admitted hundreds of inpatients and critically ill patients, including those on advanced life support, in late March and early April 2020.

21.     During the peak of the pandemic, Hospital for Special Surgery treated COVID-19 patients, as well as COVID-negative patients who needed inpatient care. It also continued to provide urgent and emergent orthopedic care, consistent with it specialty and core mission in orthopedics and rheumatology.

### C.     SUMMARY OF THE PROVIDER RELIEF FUND SHORTFALL TO HOSPITAL FOR SPECIAL SURGERY

22.     Under the CARES Act, HRSA is obligated to create PRF funding mechanisms that provide a rational basis to reimburse providers, including Hospital for Special Surgery, for lost revenue due to the pandemic. HRSA does not dispute the amount of documented lost revenue incurred by Hospital for Special Surgery for the first half of 2020, when the pandemic was raging in New York.

23.     To distribute funds in its Phase 3 of general funding (one of four phases of general funding), HRSA devised groupings of all providers nationwide, and created 27 provider groups. HRSA permitted no public input into the creation of these group. To date, HRSA has not provided any rationale for how or why it created these groups. Some of these groups were very broad, such as all "Acute Care Hospitals."  Other groupings were more precise, e.g. HRSA divided physicians into "multi-specialty" and "single specialty" groups. This grouping of providers was arbitrary, and failed to account for the unique characteristics – and revenue losses – of single specialty hospitals, such as Hospital for Special Surgery.

24.     Using these groups, HRSA reimbursed general acute care hospitals in New York (including the large hospital systems in New York City) for at least 88% of their losses. But for

Hospital for Special Surgery, HRSA drastically cut the amount of PRF funds to about 60% of Hospital for Special Surgery's eligible losses in the first half of 2020. According to HRSA, this cut was because Hospital for Special Surgery's losses were "outside the expected range" as compared to a dissimilar group of hospitals—***general acute care*** (and other) hospitals. In total, HRSA reduced its PRF funding payments to Hospital for Special Surgery by approximately $51.2 million. This reduction was arbitrary and capricious, and failed to account for the unique circumstances and losses incurred by Hospital for Special Surgery, as required by law.

25.     Specifically, in Phase 3, HRSA created and then rigidly applied an "outlier cap" to Hospital for Special Surgery and refused to conduct a manual review of that determination. There was no rational basis for imposing the "outlier cap" on Hospital for Special Surgery's lost revenue.

26.     HRSA established a Phase 3 Reconsideration process, but only to correct calculation errors. HRSA refused to create any process for waivers or exceptions to the "outlier cap," or to consider any requests for waivers or exceptions. HRSA has provided no rationale to support its "no waiver or exceptions" approach, and has provided no rationale for refusing to consider and provide a reasoned response to Hospital for Special Surgery's request for reconsideration.

27.     To remedy these arbitrary actions (the "acute care" grouping, the strict application of the "outlier cap," and the "no waiver" policy), HRSA is obligated to take into account the unique circumstances of Hospital for Special Surgery, and other specialty hospitals, if any, in pandemic hot-spot areas (as defined by HRSA) that suffered disproportionate losses as compared to general acute care hospitals due to coronavirus.

## II.     HHS AND HRSA VIOLATED THE ADMINISTRATIVE PROCEDURE ACT

### A.     CONGRESS ENACTED THE CARES ACT AND ESTABLISHED THE PROVIDER RELIEF FUND TO COMPENSATE HOSPITALS LIKE HOSPITAL FOR SPECIAL SURGERY

28.     The CARES Act, Pub. L. 116-136, 134 Stat. 281 (2020), was signed into law on March 27, 2020, to provide economic relief for, among others, health care providers impacted by the COVID-19 pandemic.

29.     Congress appropriated $100 billion " to reimburse . . . eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus." CARES Act, P.L. 116-136, 134 Stat. 281, 563.

30.     Subsequently, these funding amounts were increased by $78 billion, with $75 billion appropriated in the Paycheck Protection Program and Health Care Enhancement Act (P.L. 116-139) and $3 billion appropriated in the Consolidated Appropriations Act, 2021 (P.L. 116-260).

31.     In the CARES Act, Congress directed that the PRF fund was to be used "for necessary expenses to reimburse . . . eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus." Pub. L No. 116-136, 134 Stat. 281, 563 (2020).

32.     To achieve that, the CARES Act directed that the HHS Secretary shall, on a rolling basis, review applications and make Payments to "eligible health care providers" and further directed that HHS do so through the "most efficient payment systems practicable to provide emergency payment." *Id.*

33.     The CARES Act defines "eligible health care providers" as "public entities, Medicare or Medicaid enrolled suppliers and providers, and such for-profit entities and not-for

profit entities . . . that provide diagnoses, testing, or care for individuals with possible or actual cases of COVID-19." *Id.*

34.     The HHS Secretary delegated authority to HRSA to administer the PRF. In turn, HRSA implemented the PRF in four Phases of general funding. HRSA also decided to allocate at least six streams of targeted funding to provide relief for specific types of providers impacted by the pandemic.

35.     For each Phase of general funding, as well as targeted funding, HRSA did not seek public input, nor did it proceed by notice and comment rulemaking. Instead, for each general and targeted funding, HRSA internally developed a formula to allocate funds, and then issued agency guidance as to its allocation methodolgy.

36.     HRSA's funding phases involved complex approaches developed and implemented solely by HRSA to make general distributions, as well as targeted distributions, aimed at specific facility types with high needed, e.g. "high impact" (or "hot spot") hospitals (i.e. hospitals with high rates of COVID-19 admissions), rural providers, and "disproportionate share" providers (i.e. providers with high Medicare patient populations), Medicaid providers, and nursing homes, among others. These methodologies, and the PRF program generally, are summarized in a Congressional Research Services report on the PRF program. *See* Cong. Research Serv., *The Provider Relief Fund:  Frequently Asked Questions*, R46897, at 3 (updated Apr. 7, 2022) (the "CRS Report"), *available at* https://crsreports.congress.gov/product/pdf/R/R46897. A copy of the CRS Report is attached as **Exhibit A**.

### B.     HRSA'S METHODOLOGY FOR DISTRIBUTING PRF FUNDS

37.     In **Phase 1**, HRSA sought to distribute up to $50 billion of general distribution funding. HRSA's goal was to distribute payments to all Medicare-enrolled providers in an amount equal to 2% of each provider's annual patient revenue.

38.     HRSA reports that it allocated $42.82 billion of Phase 1 funds, as of November 12, 2021. *See* **Exhibit A**, CRS Report, at 3.

39.     Next, HRSA developed and implemented a targeted High Impact Area Distribution for hospitals located in "hot spot" areas especially hard hit by the pandemic in early 2020, including New York City.

40.     The first round of High Impact Area funding was targeted to hospitals that treated 100 or more COVID-19 patients from January 1, 2020, through March 31, 2020. The second round of "hot spot" funding was based on hospitals' reporting on COVID-19 positive inpatient admissions from January 1, 2020, through June 10, 2020, and was targeted for hospitals that had at least 161 COVID-19 positive admissions during that time period.

41.     In **Phase 2**, HRSA sought to allocate $18 billion in general funding. HRSA designed Phase 2 to target Medicaid, Medicaid managed care plans, participants in the Children's Health Insurance Program (CHIP), dental providers, and assisted living facilities and certain Medicare providers, with the goal of funding these providers in an amount equal to 2% of their total patient care revenue.

42.     HRSA reports that it allocated $5.09 billion of Phase 2 funds, as of November 12, 2021. *See* **Exhibit A**, CRS Report at 4.

43.     For **Phase 3**, HRSA designated $24.5 billion of general funding, and through its guidelines it announced that these funds were to fund health care providers, like Hospital for Special Surgery, in the amount of 88% of their lost revenue (or increased expenses) incurred between January 1, 2020, and June 30, 2020, when the pandemic in New York was raging. Phase 3 was made available to providers who had not yet received the full 2% of patient revenue from

Phase 1. A copy of HRSA's *Provider Relief Fund Phase 3: Payment Calculation Methodolog*y is attached as **Exhibit B** ("Phase 3 Methodology").

44.    As of November 22, 2021, HRSA reports that it allocated $21.36 billion (of the $24.5 billion) in Phase 3 funds to approximately 65,000 health care providers.  *See* **Exhibit A**, CRS Report at 4.

45.    HRSA paid New York City hospitals, and hospitals nationwide, for at least 88% of their revenue losses for the first half of 2020, except to the extent that HRSA imposed an arbitrary payment cap (referred to as the "outlier cap") on Hospital for Special Surgery and some other hospitals. The "outlier cap" disparately impacted Hospital for Special Surgery, and arbitrarily and capriciously limited the amount of revenue losses it was able to recover in Phase 3.

46.    Lastly, HRSA created **Phase 4** with a general distribution component and targeted distribution component, and distributed over $14.3 billion to health care providers. HRSA allocated approximately 75% of this funding to hospitals and other providers to compensate them for lost revenues and increased expenses for the period from July 1, 2020 to March 31, 2021. *See* **Exhibit A**, CRS Report at 5-6.

47.    For large hospitals, HRSA used the reported amount of revenue losses for the relevant time period, and paid them a fixed percentage (20%) of that amount.

48.    For the second component of Phase 4, HRSA used approximately 25% of the funding for "bonus payments" to providers based on the provider's level of participation in Medicaid, the Children's Health Insurance Program (CHIP), and Medicare.

**C.      HRSA CREATED AND STRICTLY APPLIED AN "OUTLIER CAP" FOR PRF PHASE 3 PAYMENTS**

49.      HRSA developed and implemented its Phase 3 methodology, without notice and comment or other public input, and announced its methodology through informal guidance documents. **Exhibit B**, Phase 3 Methodology at 1.

50.      In summary, HRSA's methodology was to calculate for each provider 88% of its losses for the first and second quarters of 2020 based on each provider's application and documentation, then to subtract prior PRF payments made to that provider, and to pay the remaining amount to the provider, so long as the provider's "loss ratio" did exceed the "outlier cap" that HRSA invented and strictly implemented, purportedly as a "risk mitigation/cost containment safeguard." *Id.*

51.      Under the Phase 3 methodology, HRSA paid eligible hospitals in New York and nationwide (and other providers) 88% of their losses for the first six months of 2020 (minus any prior payments to each provider), subject to the "outlier cap." *Id.* at 3.

52.      The core agency actions giving rise to this suit is that HRSA, in its sole determination, (1) created an "Acute Care Hospital" group of health care providers for the purpose of distributing Phase 3 funds and lumped Hospital for Special Surgery into that group; (2) calculated an acute care hospital "outlier cap" that strictly limited payments to any provider that had losses outside of a certain range *as compared to that group*; and (3) failed to create or consider any waiver, exemptions, or other safety valves to permit for consideration of Hospital for Special Surgery's unique circumstances.

53.      In the case of Hospital for Special Surgery, this created a drastic and arbitrary shortfall in payments. Hospital for Special Surgery selected the "Acute Care Hospital" group in its application because it was the only group that appeared to fit (HRSA later confirmed that any other

12

selection would have been flagged as inappropriate). Hospital for Special Surgery – a **specialty** acute care hospital – was in the "Acute Care Hospital" group, along with thousands of **general** acute care hospitals (i.e. the typical urban hospital system, community hospital, and other providers of general inpatient medical-surgical services).

54.     General acute care hospitals and specialty hospitals, like Hospital for Special Surgery, operated on dramatically different funding models during the pandemic. General acute care hospitals maintained other critical services, even while responding to COVID patients. Hospital for Special Surgery did not have the same opportunity to maintain its revenue streams.

55.     Different funding models led to different revenue losses. Specifically, Hospital for Special Surgery suffered drastic losses due to (1) its closure of elective orthopedic surgeries during the pandemic (accounting for 92% of its revenue), which it did voluntarily prior to the Governor of New York's Executive Order requiring the termination of all elective procedures in hospitals, and (2) its unique and public-minded response to respond to the pandemic surge in New York City.

56.     Under these circumstances, HRSA's decision to include Hospital for Special Surgery in the group with all "Acute Care Hospitals" nationwide would mean inexorably that it would be a "loss ratio" outlier as compared to the group.

57.     There were 27 groups of health care providers HRSA created as part of its methodology. These groupings were not subject to any directive or oversight. HRSA never publicly discussed how or why it drew categorical lines in this way. For example, for "Outpatient and Professional" providers, HRSA created 8 groups, including many single specialty groups, a "multi-specialty practice" group, and an "other single specialty" group.

58.     HRSA created these groups for the purpose of Phase 3 distributions, but then abandoned them for the later implemented Phase 4. HRSA had complete control over creating these groups.

59.     Once HRSA created groups of providers, it created its "outlier cap" for each group. HRSA's apparent rationale for creating and strictly imposing its "outlier cap" is that it wanted to limit payments to a hospital that had documented losses "outside of the expected range related to similar providers."     **Exhibit C**, HRSA Acting Administrator Espinosa's Ltr to L. Shapiro. (September 1, 2021).

60.     Hospital for Special Surgery suffered drastic losses, due to its focused mission and unique circumstances. Hospital for Special Surgery was grouped with general acute care as well as other hospitals, whose losses were not nearly as large. While general acute care hospitals in New York City were overwhelmed with COVID-19 patients, they still continued to treat other non-elective patients (e.g. patients needing cardiac, oncology, general surgery, or emergency services), and for this reason – multiple revenue-producing service lines – they incurred smaller revenue losses (as a ratio of losses/annual revenue) than Hospital for Special Surgery in the first half of 2020.

61.     Essentially, HRSA calculated the "range of expected losses" based largely on the losses by ***dissimilar*** hospitals—***general acute care and other hospitals***—then deemed Hospital for Special Surgery to be an "outlier."

62.     As a technical matter, HRSA defined the "mean loss ratio" as the mean of the reported revenue loss (calculated as the 6-month revenue loss divided by the annual total patient revenue for the prior year) for all providers in any given group. For each group that HRSA created,

it then calculated an "outlier cap" to limit payments to any provider in that group that had losses exceeding that cap (calculated for each group as the "mean loss ratio" plus 1 standard deviation).

63.     For the "Acute Care Hospital" group, HRSA calculated the "mean loss ratio" as 5.26%, and the "outlier" threshold at 11.17%. Hospital for Special Surgery's actual documented losses for the first half of 2020, which were accepted fully and uncontested by HRSA, amounted to a loss ratio of approximately 16.4% under HRSA's methodology. At least 6 groups of providers had "outlier caps" over 16%.

64.     In short, HRSA created the provider groups, then imposed a strict payment cap for each group. Putting Hospital for Special Surgery in the "Acute Care Hospital" group, and then capping payments to it, failed to account for the uniqueness of specialty hospitals, like Hospital for Special Surgery, whose losses were expected to be, and in fact were, greater than the losses of general acute care hospitals.

### D.     HRSA'S SHORTFALL OF PRF PAYMENTS TO HOSPITAL FOR SPECIAL SURGERY

65.     In Phase 1 of HRSA's general allocation of PRF funds, Hospital for Special Surgery received $22,595,203.42 (2% of its patient revenue), in four installments between April and June 2020 in round one of targeted High Impact Area funding.

66.     In accordance with HRSA's policies and funding formulas, on July 20, 2020, Hospital for Special Surgery received $8,150,000 in round two targeted High Impact Area funding.

67.     Hospital for Special Surgery did not receive any general distribution from Phase 2.

68.     For Phase 3 general distribution, on October 14, 2020, Hospital for Special Surgery submitted an application and all required documentation in support of its application. A redacted copy of the application cover page is attached as **Exhibit D**.

69.     Hospital for Special Surgery's Phase 3 application documented that its revenue loss for the relevant time period (January 1, 2020 through June 30, 2020), as calculated under the HRSA guidelines, was $183,113,578.

70.     HRSA does not dispute, and appears to concur with, Hospital for Special Surgery's calculation of revenue loss in its Phase 3 application.

71.     Thus, Hospital for Special Surgery was, and is, entitled to receive PRF funds totaling 88% of this revenue loss, which is a payment in the amount of $161,139,949 (minus prior PRF payments).

72.     However, HRSA applied its arbitrary and contrived "outlier cap" to the payment otherwise owed to Hospital for Special Surgery. Under this approach, HRSA "adjusted" and "capped" Hospital for Special Surgery's losses downward to $124,931,955, then calculated the payment at 88% of that revised amount, which was $109,940,121.

73.     Thus, instead of paying $161,139,949 to Hospital for Special Surgery, HRSA paid it $109,940,121 (minus prior payments). The prior payments totaled $30,745,203. So the actual Phase 3 payment provided to Hospital for Special Surgery was in the amount of $79,194,918, which it received on December 14, 2020.

74.     As a result, HRSA reduced Hospital for Special Surgery's funding by $51,199,828. Put another way, HRSA paid Hospital for Special Surgery for about 60% of its actual and documented revenue losses, instead of the 88% of revenue losses it was entitled to and that, on information and belief, other New York hospitals received if under the "outlier cap."

75.     In Phase 4 general distribution, on April 14, 2022, Hospital for Special Surgery received $12,312,234.70, in accordance with the Phase 4 methodology that compensated hospitals on the basis of 20% of reported losses for the time period July 1, 2020, through March 31, 2021.

76.     In its Phase 3 funding determination, HRSA failed to take into account Hospital for Special Surgery's circumstances and its documented revenue loss for the first half of 2020. Additionally, HRSA has never articulated any "risk mitigation" basis for drastic cuts to payments to Hospital for Special Surgery. Accordingly, HRSA's cap on Phase 3 payment to Hospital for Special Surgery—based only on the misplaced rationale that Hospital for Special Surgery fell outside the "expected range" of loss ratios for "acute care hospitals"—was arbitrary and capricious.

**E.     HOSPITAL FOR SPECIAL SURGERY SOUGHT RECONSIDERATION OF ITS PHASE 3 AWARD, AND HAS URGED HRSA TO REMEDY THE SHORTFALL**

77.     HRSA set up a process for providers to request reconsideration of awards under Phase 3 ("Phase 3 Reconsideration").

78.     Prior to this process, HRSA officials had informed Hospital for Special Surgery that HRSA would be setting up a reconsideration process and encouraged Hospital for Special Surgery to apply for reconsideration to address the funding shortfall.

79.     In public guidance, HRSA stated that the Phase 3 Reconsideration process was to correct mistakes and miscalculations, and that it would not reconsider issues regarding "methodology."

80.     HRSA established no procedure for a provider to seek an exemption, or waiver, or otherwise seek relief from the strict application of HRSA's unilateral groupings and application, for each group, of an "outlier cap."

81.     On November 9, 2021, Hospital for Special Surgery timely submitted a request Phase 3 Reconsideration.

82. HRSA has repeatedly said that it will deny Hospital for Special Surgery's Phase 3 Reconsideration, but it either has not made that final decision or has not communicated it in an official letter or other document to Hospital for Special Surgery.

83. From June 2021 through June 2022, Hospital for Special Surgery took numerous other actions to get HRSA to consider its devastating financial losses due to the pandemic, and HRSA's shortfall of Phase 3 payments. These actions included the communications and meetings described in the following paragraphs.

84. On June 1, 2021, Hospital for Special Surgery's President and CEO wrote a letter to Secretary Becerra and explained that early in the pandemic when COVID-19 began to overrun New York's health care system, it proactively and voluntarily shut down its elective surgery, representing 92% of its revenue, and converted its resources to care for COVID-positive patients as well as COVID-negative patients outside of its specialties in musculoskeletal care to relieve other New York City hospitals facing bed shortages. This letter is attached as **Exhibit E**. At this time in New York City, in contrast, general acute care hospitals did not shut down; instead, they continued to treat patients within their medical-surgical services lines, plus they were busting at the seams from admissions of COVID-19 patients, all of which provided revenue streams unavailable to Hospital for Special Surgery.

85. The letter recounted that its efforts, developed specifically to respond to the pandemic in the way Hospital for Special Surgery best could through its leadership and resources, took an enormous and historic toll on Hospital for Special Surgery's finances. The letter also explained that, due to the decision making of the previous administration, it had not been reimbursed to the same levels as other hospitals in New York City, and that Hospital for Special

Surgery requested that its pandemic-related losses be treated in the same fashion as other New York City hospitals.

86.     In August 2021, Hospital for Special Surgery's President and Chief Executive Officer sent a white paper, setting out the issue and requesting relief, to the then-Acting HRSA Administrator Diana Espinosa. The white paper is attached as **Exhibit F.**

87.     Also in August 2021, Hospital for Special Surgery requested a meeting with the HRSA Chief of Staff and the Counselor to the HHS Secretary. That meeting took place on September 14, 2021. In the meeting, Hospital for Special Surgery explained the shortfall of funding and urged for PRF compensation commensurate with the payments to other New York hospitals.

88.     On September 1, 2021, then-Acting HRSA Administrator Diana Espinosa responded with a letter to Hospital for Special Surgery and simply recounted the agency's Phase 3 methodology, and indicated that it would not provide any relief for the payment reduction of $51.2 million. In that letter, HRSA's stated rationale for the shortfall was "risk mitigation" and "cost containment." HRSA penalized Hospital for Special Surgery for being "outside the expected range of reported revenue for their provider type." This letter failed to recognize that HRSA lumped Hospital for Special Surgery in a very large group of "Acute Care Hospitals" which included general acute care hospitals, and others, and thus created a methodology that inexorably would identify Hospital for Special Surgery as an "outlier" in terms of lost revenue. *See* **Exhibit C**.

89.     On October 19, 2021, the New York congressional delegation sent a letter to Secretary Becerra to urge that HRSA consider and agree to Hospital for Special Surgery's request to HHS to be fairly compensated with PRF funds in the Phase 3 Reconsideration process. A copy

of the New York congressional delegation's October 19, 2021 correspondence is attached as **Exhibit G**.

90.     On November 9, 2021, Hospital for Special Surgery timely submitted its application for Phase 3 Reconsideration. Along with the application and documentation, Hospital for Special Surgery submitted a short narrative entitled *HSS Provider Relief Fund Phase 3 Reconsideration Narrative*. In this narrative, Hospital for Special Surgery again explained that it is "not like other acute care hospitals who have other revenue sources from other service lines to help stem the tide of losses," and to "account for this unique situation and ensure equity in PRF funding, Hospital for Special Surgery should be reimbursed a minimum of 88% of [its] losses, in line with [its] peer hospitals in New York City." The narrative articulated that the funding shortfall was solely "due to [its] classification as an outlier [in the acute hospital group]," which caused Hospital for Special Surgery to "not receive funding at a level that would have been equitable to the funding [its] NYC peers received" as explained in its reconsideration submission. This narrative is attached as **Exhibit H**.

91.     In January 2022, Hospital for Special Surgery requested another meeting with current HRSA Administrator Johnson and her Chief of Staff, and continued these efforts directly and through the New York congressional delegation through the first half of 2022.

92.     On April 12, 2022, HRSA briefed the offices of several New York members of Congress about the agency's PRF funding decisions for Hospital for Special Surgery. During this briefing HRSA stated that Hospital for Special Surgery would be getting a Phase 4 general distribution and, though they recognized Hospital for Special Surgery's unique situation, HRSA would be denying its Phase 3 Reconsideration.

93.     On June 6, 2022, Hospital for Special Surgery's President and CEO met via videoconference with Administrator Johnson, members of her staff, and Representative Carolyn Maloney to urge that HRSA remedy the payment shortfall to Hospital for Special Surgery. In that meeting, Hospital for Special Surgery explained that HRSA was obligated to remedy the impact of the outlier policy because Hospital for Special Surgery is a uniquely specialized hospital that suffered losses in excess of those incurred by general acute care hospitals. Hospital for Special Surgery conveyed that HRSA had the legal authority from Congress to pay Hospital for Special Surgery commensurate with other New York hospitals, the discretion to remedy the shortfall, and the obligation to do so.

94.     Administrator Johnson replied that she did not want to make changes or exceptions to the outlier policy, that Phase 3 Reconsideration was meant only to fix agency mistakes in calculations, and that HRSA lacked internal resources to remedy the shortfall. She also said (mistakenly) that Phase 4 general distributions were meant to correct any deficiencies in Phase 3, but Hospital for Special Surgery noted that Phase 4 does not address revenue losses for the first half of 2020. Further, Administrator Johnson said that if HRSA had selected "Other" in its Phase 3 application, its program integrity office would have raised a red flag.

95.     On June 9, 2022, Hospital for Special Surgery's President and CEO sent a letter to Secretary Becerra explaining the issue and requesting a meeting with him. The letter recounted that HRSA remained firm in its refusal to reconsider additional funding to remedy the shortfall, and again conveyed HRSA's obligation to treat Hospital for Special Surgery like other New York hospitals, and HRSA's clear ability to do so. This letter is attached as **Exhibit I**.

96.     Specifically, Hospital for Special Surgery conveyed that "HHS, through HRSA, has the obligation to consider and respond to the circumstances of Hospital for Special Surgery.

HHS, through HRSA, has the tools and budget to correct the funding shortfall, and under the Administrative Procedures Act, is obligated to do so."

97.     Further, in that letter to Secretary Becerra, Hospital for Special Surgery provided three suggestions for how HHS and HRSA could remedy the funding shortfall, including:

(1)     The agency could lift the "outlier cap" as applied to specialized hospitals in COVID-19 hot spot areas (previously identified by HRSA), which includes Hospital for Special Surgery. This strategy would not require recalculation of the mean loss ratio and standard deviation for the "hospital group", which would remain intact.

(2)     HRSA could craft a targeted funding stream to rectify the existing shortfall. The creation of this fund would be consistent with other targeted funding that took into account providers with unique circumstances, like Hospital for Special Surgery.

(3)     HRSA has access to the hospital relief payment data and can use this data to create a different, fair and narrow solution, consistent with the program goals and prior distributions.

98.     On September 20, 2022, Hospital for Special Surgery's President and CEO met with Secretary Becerra and his senior staff, via video conference, to again seek equitable treatment and appropriate compensation from PRF funds. At that meeting, Secretary Becerra indicated that HRSA had considered the matter and denied the request.

99.     Despite knowing that the imposition of its payment cap created a shortfall of payments of $51.2 million to Hospital for Special Surgery, in its Phase 3 Reconsideration, HRSA

has refused to consider the unique circumstances of Hospital for Special Surgery and remedy the shortfall in funding, which also is an arbitrary and capricious agency action.

**COUNT I**
**DECLARATORY RELIEF**
**(PRF PAYMENT SHORTFALL)**
**(5 U.S.C. § 706, 28 U.S.C. §§ 2201-2202)**

100.    Hospital for Special Surgery restates and realleges the preceding paragraphs as if fully stated herein.

101.    The APA authorizes judicial review of agency actions. 5 U.S.C. § 702.

102.    HHS and HRSA developed groups of providers for purposes of administering billions of dollars of PRF funds to hospitals and other providers nationwide. HHS and HRSA never provided any rationale for creating groups of providers, or any rationale for dealing with the impact of these groups on dissimilar providers lumped in the "Acute Care Hospital" group.

103.    HHS and HRSA placed Hospital for Special Surgery in the "Acute Care Hospital" group and thus ensured that its losses would be an "outlier" as compared to the losses of general acute care and all other hospitals nationwide.

104.    HHS and HRSA developed and strictly applied an "outlier cap" to the payments otherwise owed to Hospital for Special Surgery.

105.    HHS and HRSA did not create any process for providers to seek waivers, exceptions, or any other safety valve for the "outlier cap" to ensure that providers fairly received PRF funds for revenue losses due to the pandemic in accordance with HRSA's policy to reimburse providers for 88% of revenue losses for the first half of 2020.

106.    Hospital for Special Surgery is entitled to payment from the PRF to compensate it for 88% of its documented revenue losses for the first half of 2020, calculated as 88% of those losses, or the amount of $161,139,949 (minus prior PRF payments).

107.    HHS and HRSA, instead, allocated to Hospital for Special Surgery $161,139,949 in Phase 3 funding which, after deducting prior PRF payments, resulted in a payment of $79,194,918.

108.    The APA allows a Court to set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. 5 U.S.C. § 706(2)(A).

109.    HHS's and HRSA's decision to place Hospital for Special Surgery in the "Acute Care Hospital" group was arbitrary and capricious under the APA.

110.    HHS's and HRSA's decision to apply the "outlier cap" to Phase 3 payments to Hospital for Special Surgery, without any waiver or exception process, was arbitrary and capricious under the APA.

111.    For all the above reasons, Defendants' actions and inactions, individually and collectively, are arbitrary, capricious, an abuse of discretion or otherwise contrary to law and should be set aside.

## COUNT II
## DECLARATORY RELIEF
## (DENIAL OF PHASE 3 RECONSIDERATION)
## (5 U.S.C. § 706, 28 U.S.C. §§ 2201-2202)

112.    Hospital for Special Surgery restates and realleges the preceding paragraphs as if fully stated herein.

113.    The APA authorizes judicial review of agency actions. 5 U.S.C. § 702.

114.    Hospital for Special Surgery is entitled to payment from the PRF to compensate it for 88% of its documented revenue losses for the first half of 2020, calculated as 88% of those losses, or the amount of approximately $162 million.

115.    HHS and HRSA, instead, allocated to Hospital for Special Surgery approximately $109.9 million in Phase 3 funding which, after deducting prior PRF payments, resulted in a payment of $79,194,918.

116.    HHS and HRSA developed and implemented a Phase 3 Reconsideration process that did not permit for any waivers or exemptions, and in practice did not consider Hospital for Special Surgery's individual circumstances in support of its request for reconsideration of the decision to apply the "Acute Care Hospital" "outlier cap" to its documented revenue losses for the first half of 2020.

117.    Since June 2021, HHS and HRSA knew or should have known that the Phase 3 methodology of "grouping," and strict application of the "outlier cap" it devised, created an inequitable result as applied to Hospital for Special Surgery, resulting in a shortfall of funding to Hospital for Special Surgery as compared to its New York peers.

118.    HHS and HRSA failed to consider the unique circumstances and the expected losses for a specialty hospital in a "hot spot" area, New York City, in the first half of 2020, and failed to provide any rationale for rejecting Hospital for Special Surgery's request for Phase 3 Reconsideration or for it blanket refusal to consider any requests for exemptions or waivers.

119.    The APA allows a Court to set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. 5 U.S.C. § 706(2)(A).

120.    HHS and HRSA's denial of Hospital for Special Surgery's request for Phase 3 Reconsideration was arbitrary and capricious under the APA.

121.    In the alternative, if the agency's denial of Hospital for Special Surgery's Phase 3 Reconsideration is not deemed by the Court to be "final action," HHS and HRSA have "unlawfully withheld or unreasonably delayed" the agency action of a formal denial.

122.    The APA allows a Court to "compel agency action unlawfully withheld or unreasonably delayed," and this Court should compel the agency to take its "final action." 5 U.S.C. § 706(1).

123.    For all the above reasons, Defendants' actions and inactions are arbitrary, capricious, an abuse of discretion or otherwise contrary to law and should be set aside.

## COUNT III
## INJUNCTIVE RELIEF
### (5 U.S.C. § 705)

124.    Hospital for Special Surgery restates and realleges the preceding paragraphs as if fully stated herein.

125.    Section 705 of the APA provides that, to prevent irreparable injury, a reviewing court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

126.    Pursuant to the CARES Act, Hospital for Special Surgery is entitled to Provider Relief Funds to reflect its revenue losses due to the pandemic for the first half of 2020 on an equitable basis with other New York City hospitals.

127.    Hospital for Special Surgery is likely to prevail under the APA because HHS's and HRSA's creation of the "Acute Care Hospital" group, imposition of the "outlier cap" without waiver or exemption to deprive Hospital for Special Surgery of $51.2 million in PRF payments, and their failure to remedy this shortfall through Phase 3 Reconsideration, were arbitrary and capricious, as alleged above.

128.    This payment shortfall has resulted in injury to Hospital for Special Surgery by depriving it of $51.2 million in funding under the CARES Act.

129.    HHS's and HRSA's disbursement of the remaining PRF funds appropriated by Congress threatens Hospital for Special Surgery with imminent, irreparable injury. When HRSA exhausts the PRF funds and has no remaining appropriation, this Court will not be able to order relief for any violations of the APA. Hospital for Special Surgery will be without an adequate remedy.

130.    Consequently, Hospital for Special Surgery is entitled to a preliminary injunction enjoining Secretary Becerra, Administrator Johnson, and HHS from distributing at least $51.2 million of PRF funds, until such time as Secretary Becerra, Administrator Johnson and HHS comply with their obligation to allocate PRF funds to Hospital for Special Surgery in accordance with the CARES Act and the requirements of the APA.

**PRAYER FOR RELIEF**

Wherefore, Hospital for Special Surgery respectfully requests the Court:

1.      Enter judgment pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706 declaring that HHS's Phase 3 methodology for distributing PRF funds was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and procedural requirements;

2.      Enter judgment pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706 declaring that HHS's failure to correct through Phase 3 Reconsideration the known shortfall in PRF payments to Hospital for Special Surgery was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the CARES Act; or, alternatively, if there has not been agency final action, compel the agency to take final action that was unlawfully delayed and unreasonably withheld;

3.      Enjoin HHS, Secretary Becerra, and Administrator Johnson from distributing, disbursing, or otherwise depleting funds in the amount of no less than $51.2 million of PRF funds, until such time as HHS distributes PRF funds to Hospital for Special Surgery consistent with the purpose of the CARES Act; or alternatively, under 5 U.S.C. § 705, stay HHS and Secretary Becerra's PRF funding determinations  to preserve the status quo and prevent the government from depleting PRF funds until such time as HHS distributes PRF funds to Hospital for Special Surgery consistent with the purpose of the CARES Act; and

4.      Award Hospital for Special Surgery its reasonable attorney fees, costs, and such other and further relief as the Court deems just and proper.

Respectfully submitted,

**HOSPITAL FOR SPECIAL SURGERY**

By its attorneys,


*/s/ Laurence J. Freedman*
Laurence J. Freedman (D.C. Bar 423099)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
  AND POPEO, P.C.
555 12th Street NW, Suite 1100
Washington, DC 20004
Tel: (202) 434-7300
LJFreedman@mintz.com

Grady R. Campion (*pro hac vice* forthcoming)
Nicole E. Henry (*pro hac vice* forthcoming)
Evelyn Limon (*pro hac vice* forthcoming)
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
  AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Tel: (617) 542-6000
GRCampion@mintz.com
NEHenry@mintz.com
ELimon@mintz.com

Dated:  September 27, 2022

29