**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**HOSPITAL FOR SPECIAL SURGERY,**
    **Plaintiff,**

    **v.**

**XAVIER BECERRA et al.,**
    **Defendants.**

**Civil Action No. 22-2928 (JDB)**

<u>**MEMORANDUM OPINION**</u>

Before the Court are cross-motions for summary judgment filed by plaintiff Hospital for Special Surgery ("HSS") and defendants Xavier Becerra, Secretary of the U.S. Department of Health and Human Services, Carole Johnson, Administrator of the Health Resources and Services Administration ("HRSA"), and the U.S. Department of Health and Human Services (collectively "HHS" or the "Agency").  HSS filed this lawsuit in September 2022 alleging that it should have received an additional $51.2 million as part of the government's distribution of funds to health care providers during Phase 3 of pandemic relief funding pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act").  HSS argues that the Agency's actions related to this distribution of payments were arbitrary and capricious in violation of the Administrative Procedure Act ("APA").  For the reasons explained below, the Court disagrees and will accordingly grant the Agency's motion for summary judgment and deny HSS's motion for summary judgment.

<u>**Background**</u>

**I.    Statutory and Regulatory Background**

Congress appropriated funds to the Provider Relief Fund ("PRF") under the CARES Act "for necessary expenses to reimburse . . . eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus," specifying that the funds were "to

remain available until expended."  CARES Act, Pub. L. No. 116-136, 134 Stat. 281, 563 (2020);

J.A. [ECF No. 32] ("AR") at 570.[1]  All told, Congress funded the PRF with $178 billion in

appropriations.  See AR 570 ($100 billion in appropriations from the CARES Act); id. 575–76

($75 billion in appropriations from the Paycheck Protection Program and Health Care

Enhancement Act); id. 588–89 ($3 billion in appropriations from the Coronavirus Response and

Relief Supplemental Appropriations Act, 2021).

The CARES Act directed the HHS Secretary (the "Secretary") to, "on a rolling basis,

review applications and make payments under this paragraph in this Act . . . in consideration of

the most efficient payment systems practicable to provide emergency payment."  134 Stat. at 563.

The Secretary delegated the authority to distribute the funds to HRSA, a sub-agency of HHS.

HSS's Mem. of P. & A. in Supp. of Mot. for Summ. J. [ECF No. 21-1] ("Pl. Br.") at 6; see AR

633–63 (HRSA "PRF HHS Strategic Planning Meeting" slide deck).  HRSA developed both the

methodology to distribute these funds and a plan to distribute the funds in four phases.  See AR

633–63; Pl. Br. at 6–8.  HRSA designated $50 billion for Phase 1 general distribution, which was

"sent directly to providers who bill Medicare" and a majority of which was not contingent on the

submission of an application.  AR 636.  It then designated $18 billion for Phase 2 general

distribution, which involved "[a]pplication-based payments to Medicaid . . . and other providers

who were not included in Phase 1."  Id.  An additional $55.9 billion was also allocated for targeted

distribution prior to Phase 3.  See id.  Thus, by the time Phase 3 began, "[n]early $125B of the

$175B total PRF funding available ha[d] been allocated via general and targeted distributions."

Id. (emphasis omitted).

---

[1] The CARES Act refers to the fund at issue as the "Public Health and Social Services Emergency Fund."
134 Stat. at 563.  The fund was later termed the "Provider Relief Fund," see Elayne J. Heisler, Cong. Rsch. Serv.,
R46897, The Provider Relief Fund: Frequently Asked Questions 1 (updated Apr. 7, 2022), and the parties refer to it
as such.

Most relevant for this case, HRSA designated $24.5 billion for Phase 3 general distribution and invited "[p]roviders previously eligible from earlier phases or who had already received [PRF] payments . . . to apply for additional payments that would take into account their financial losses and changes in operating expenses caused by the coronavirus."  AR 1535.  "Processing Phase 3 applications involved determining the greater of 88 percent of losses (i.e., losses in revenue net of expenses) for the first and second quarters of 2020 or 2 percent of net patient revenue from a provider's application submission, minus prior [PRF] payments made to that provider . . . ."  Id. 424.  HRSA created 27 provider categories and asked providers to "self-identify with a primary provider type" on their applications.  Id. 9; see id. 780 (listing 27 provider types).  It created an "outlier cap" that capped funding for providers whose losses were outside the expected range for their provider group.  See Pl. Br. at 10; Combined Mem. in Opp'n to Pl.'s Mot. for Summ. J. & in Supp. of Defs.' Cross-Mot. for Summ. J. [ECF No. 28] ("Defs. Br.") at 6–8; AR 424 (noting that one step of the methodology was "[c]apping [l]oss [r]atios").  Accordingly, HRSA

> flag[ged] a provider as an outlier if that provider's ratio of losses to their annual patient care revenues was not within a defined expected range based on their self-selected provider type.  The Agency defined the expected range as the mean loss ratio plus one standard deviation, and each provider type had its own expected range.

Defs. Br. at 8 (citing AR 424–28); accord Pl. Br. at 10.  Payment was "capped for outlier submissions to one standard deviation . . . above the mean for that provider type," AR 404, meaning outliers were "reimburse[d] [at] levels beneath the 88% threshold," Pl. Br. at 13; see Defs. Br. at 8.  Ultimately, $19.5 billion was distributed during Phase 3 general distribution.  AR 1535; see also Defs. Br. at 32 n.14.

HRSA also established a process for providers to request reconsideration of their awards in Phase 3.  AR 1068; see id. 1156–66 (2021 standard operating procedure for reconsideration

process), 1185–96 (same for 2022).   The reconsideration process "provide[d] a forum for correcting potential errors in PRF Phase 3 payment calculations." Id. 1068.   HRSA stated that it would "only consider reconsideration requests from providers who believe their Phase 3 payment calculation was incorrect" and would "not consider reconsideration requests that would require a change to payment methodology or policy." Id.

## II.   Factual Background

HSS is "a non-profit 501(c)(3) organization" and "the world's leading academic medical center focused on musculoskeletal health and the oldest orthopedic hospital in the United States." Pl. Br. at 4.   During the COVID-19 pandemic, HSS "shut down its elective surgery services, which accounted for 92% of its revenue," to accommodate COVID-19 patients. Id. at 5; AR 416.   As a result, HSS suffered approximately $183 million in revenue loss in the first half of 2020.   AR 450.

HSS received approximately $30.7 million of PRF funds during Phases 1 and 2, see Decl. of Todd Gorlewski [ECF No. 2-3] ("Gorlewski Decl.") ¶¶ 3–4, and applied for Phase 3 funding in October 2020, see AR 79–282 (HSS's Phase 3 application).   It selected the "Acute Care Hospital" provider type on its application for funding. See id. 79.   The mean-loss ratio for the Acute Care Hospital group was 5.26%, with the outlier threshold calculated at 11.17%. Id. 425.   Because HSS's loss ratio was 16.37%, id. 450, it was an outlier and its payment was capped.   Accordingly, HRSA adjusted HSS's revenue loss down from approximately $183 million to $124,931,955. Id. 420.   HRSA calculated HSS's payment as $109,940,120.83, which was 88% of HSS's adjusted revenue loss. Id.   It then subtracted the amount of PRF funds HSS had already received in previous phases ($30,745,203.42), resulting in a final Phase 3 payment of $79,194,917.44. Id.   The application of the outlier cap caused HSS's funding to be reduced by $51,199,828.   Gorlewski Decl. ¶ 10.

HSS submitted a request for reconsideration of its award on November 9, 2021.  AR 431–32.  The submission explained that HSS is "not like other acute care hospitals who have other revenue sources from other service lines to help stem the tide of losses," and to "account for this unique situation and ensure equity in PRF funding, HSS should be reimbursed a minimum of 88% of [its] losses, in line with [its] peer hospitals in New York City."  Id. 432.  HRSA denied HSS's request for reconsideration "because the original Phase 3 payment was correctly calculated per the Phase 3 Methodology" and "[t]he Phase 3 reconsideration process does not make changes to payment determinations that would require a change to payment methodology or policy."  Id. 458–59.  HSS tried several more times to informally petition HHS for relief during the Phase 3 reconsideration process to no avail.  See Pl. Mot at 18–19; AR 415–16, 418–19; Compl. for Inj. & Decl. Relief [ECF No. 1] ("Compl.") ¶ 98.

## III.    Procedural Background

HSS filed this lawsuit in September 2022 challenging three decisions the Agency made when it designed and implemented its Phase 3 funding methodology: "(1) creat[ing] overbroad provider type categories (including a one-size fits all category for Hospitals nationwide); (2) rigidly appl[ying] an outlier cap to underpay reimbursement to certain providers in each category; and (3) limit[ing] Phase 3 Reconsideration to only 'calculation errors' and refus[ing] to reconsider inequitable funding decisions."  Pl. HSS's Mot. for Summ. J. [ECF No. 21] ("Pl. Mot.") at 2; accord Compl. ¶¶ 100–30.  HSS seeks declaratory and injunctive relief in the form of payment of the alleged $51.2 million shortfall that resulted from the application of the outlier cap.  See Compl. ¶¶ 100–123.  Specifically, HSS requests that the Court

> [e]njoin [defendants] from distributing, disbursing, or otherwise depleting funds in
> the amount of no less than $51.2 million of PRF funds, until such time as HHS
> distributes PRF funds to Hospital for Special Surgery consistent with the purpose
> of the CARES Act;  or alternatively, . . . stay [defendants'] PRF funding

determinations to preserve the status quo and prevent the government from depleting PRF funds until such time as HHS distributes PRF funds to Hospital for Special Surgery consistent with the purpose of the CARES Act.

Id. at 28.

On the same day HSS filed its complaint, it also filed a motion for preliminary injunction asking the Court to enjoin defendants from allocating or disbursing the $51.2 million in PRF funds to which it claims it is entitled. See Mot. for Prelim. Inj. [ECF No. 2] at 1. The parties then jointly moved to vacate the motion without prejudice in October 2022 after the Agency "provided representations . . . indicating that there [we]re sufficient PRF funds in the Phase 3 Reconsideration budget to pay the $51.2 million Hospital for Special Surgery seeks to recover in this civil action." Joint Mot. to Vacate Pending Prelim. Inj. Mot. [ECF No. 10] ¶ 3. The Agency also "agreed to provide notice to Plaintiff . . . before any agency action that would cause the Phase 3 Reconsideration PRF budget to have insufficient funds in the event that Hospital for Special Surgery prevails in this action." Id. The Court granted the motion to vacate, see Oct. 12, 2022 Min. Order, and set a summary judgment briefing schedule, see Apr. 17, 2023 Min. Order.

On May 12, 2023, per the briefing schedule, HSS filed a motion for summary judgment. See Pl. Mot. Six days later, on May 18, 2023, HSS renewed its motion for a preliminary injunction because it claimed "the federal funds at issue in this APA lawsuit are at imminent risk of rescission by Congress." HSS's Mem. of P. & A. in Supp. of Renewed Mot. for Prelim. Inj. [ECF No. 22-1] at 1. HSS claimed that the Agency's previous assurances were no longer adequate because "[t]he funds at issue—unobligated pandemic relief funds—[were] likely to be rescinded by Congress before June 1, 2023." Id. Therefore, it argued that a preliminary injunction was necessary because "[i]f unobligated PRF funds [were] rescinded, [it] w[ould] be left with no remedy for this $51.2 million arbitrary underfunding." Id.

The Court ordered expedited summary judgment briefing, see May 30, 2023 Min. Order, and the next day denied HSS's renewed motion for preliminary injunction, reasoning that HSS was not likely to be successful on the merits and that the harm HSS claimed was neither great nor certain enough to justify a preliminary injunction, see May 31, 2023 Order [ECF No. 26] ("Prelim. Inj. Order").  Per the accelerated schedule, defendants filed a combined opposition to HSS's motion for summary judgment and cross-motion for summary judgment on June 2, 2023.  See Cross-Mot. for Summ. J. [ECF No. 28] ("Defs. Mot."); Defs. Br.  The next day, Congress passed the Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, 137 Stat. 10, which permanently rescinded the appropriations that funded the PRF but carved out approximately $2.9 billion from recission.  137 Stat. at 23–24; see HSS's Combined Reply in Supp. of Its Mot. for Summ. J. & Opp'n to Defs.' Cross-Mot. for Summ. J. [ECF No. 29] ("Pl. Reply") at 1–2.  On June 6, HSS filed a combined reply in support of its motion and opposition to defendants' motion, see Pl. Reply, defendants filed a reply in support of their motion on June 13, see Reply in Supp. of Defs. Mot. [ECF No. 31] ("Defs. Reply"), and the parties filed a joint appendix on June 23, see AR.  Both motions are now fully briefed and ripe for decision.

## Legal Standard

In reviewing agency decisions, "the district judge sits as an appellate tribunal," and the "'entire case' on review is a question of law."  Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  "Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review."  Styrene Info. & Rsch. Ctr., Inc. v. Sebelius, 944 F. Supp. 2d 71, 77 (D.D.C. 2013) (internal quotation marks omitted).

A reviewing court may set aside a final agency decision if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[T]he scope of review under the 'arbitrary and capricious' standard is narrow[,] and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). A court should "not disturb the decision of an agency that has 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" MD Pharm., Inc. v. Drug Enf't Admin., 133 F.3d 8, 16 (D.C. Cir. 1998) (alterations in original) (quoting State Farm, 463 U.S. at 43). There is no requirement that an agency's decision "be a model of analytic precision to survive a challenge," Dickson v. Sec'y of Def., 68 F.3d 1396, 1404 (D.C. Cir. 1995); instead, "[a] reviewing court will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,'" id. (quoting Bowman Transp., Inc. v. Arkansas-Best Motor Freight Sys., 419 U.S. 281, 286 (1974)). The bar for arbitrary and capricious action is high: "[i]t is not enough . . . that the court would have come to a different conclusion from the agency," Conservation L. Found. v. Ross, 422 F. Supp. 3d 12, 27 (D.D.C. 2019), nor can the court "substitute its own judgment for that of the agency," id. at 28 (quoting Oceana, Inc., v. Pritzker, 24 F. Supp. 3d 49, 58 (D.D.C. 2014)). To survive APA review, there need only be a "rational connection between the facts found and the choice made." Id. (quoting State Farm, 463 U.S. at 43).

## Analysis

### I.   This Case Is Not Moot

Because the appropriations funding the PRF (minus the $2.9 billion carveout) were permanently rescinded, there is a threshold question of whether this case is now moot. A case is considered moot "when the issues presented are no longer live or the parties lack a legally

cognizable interest in the outcome."  Powell v. McCormack, 395 U.S. 486, 496 (1969); see also Pharmachemie B.V. v. Barr Labs., Inc., 276 F.3d 627, 631 (D.C. Cir. 2002) (stating that a case is moot if "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future" (quoting Clarke v. United States, 915 F.2d 699, 701 (D.C. Cir. 1990))).  "Thus, 'when it is impossible for a court to grant "any effectual relief whatever" to the prevailing party,' the case must be dismissed as moot." Gorgadze v. Blinken, Civ. A. No. 21-2421 (JDB), 2022 WL 2702324, at *2 (D.D.C. July 12, 2022) (quoting Zukerman v. U.S. Postal Serv., 961 F.3d 431, 442 (D.C. Cir. 2020)).  Indeed, "a federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'"  Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (quoting Mills v. Green, 159 U.S. 651, 653 (1895)).

HSS acknowledges that "this case may be moot" "if the funds at issue have been rescinded."  Pl. Reply at 2–3.  But it states that it "does not know whether the funds at issue in this lawsuit remain available" and that "[t]he Agency has not been transparent about the purposes or uses of the approximately $2.9 billion in appropriated funds that were carved out from rescission by the Fiscal Responsibility Act."  Id. at 3.  HSS further contends that

> [i]f the Agency retains available funds that could be used to satisfy Hospital for Special Surgery's PRF funding shortfall, then the Court retains the power to rule on the merits, and remand this case to the Agency [to] reprocess Hospital for Special Surgery's request for reconsideration or, at least, further explain the justification for Hospital for Special Surgery's reduced Phase 3 reimbursement.

Id.

Defendants, for their part, urge that the case is not moot.  See Defs. Reply at 1–3.  They assert that they "do[] not understand the Fiscal Responsibility Act as making 'it impossible for a

court to grant [Plaintiff] any effectual relief whatever' in Plaintiff's Administrative Procedure Act action 'seeking relief other than money damages.'"   Id. at 1–2 (alteration in original) (quoting Chafin v. Chafin, 568 U.S. 165, 172 (2013)).   However, defendants note that the Agency "has publicly stated that subsequent to the passage of the Fiscal Responsibility Act of 2023 'no further payments    will    be    made    to    providers    under    the    Provider    Relief    Fund . . . , including . . . reconsideration payments.'"   Id. at 2 n.2 (quoting HRSA, Provider Relief Program Update: June 2023, https://www.hrsa.gov/provider-relief).

But the availability of funds is not dispositive on mootness for one simple reason: the likely remedy in this case would be a remand to the Agency, which may or may not result in an award of funds.   As defendants (and this Court in its Order denying a preliminary injunction) noted, "Plaintiff's desired outcome from this litigation . . . [is] an additional payment of $51.2 million— but it is not at all clear that such a result would occur even if Plaintiff prevailed in this litigation. The normal remedy for an APA violation is remand back to the Agency with or without vacatur of the challenged action."   Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. [ECF No. 23] ("Defs. Prelim. Inj. Opp'n") at 33 (first citing Allina Health Servs. v. Sebelius, 746 F.3d 1102, 1110 (D.C. Cir. 2014), and then citing PPG Indus., Inc. v. United States, 52 F.3d 363, 365 (D.C. Cir. 1995) ("Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency[.]")); accord Prelim. Inj. Order at 22.   Defendants further observed that "Plaintiff fails to explain how a potential ruling that the Agency's decision to require the self-reporting of provider types, to use an outlier quality control with a payment cap, or to employ a reconsideration process focused on Agency calculation errors was unreasonable necessarily results in Plaintiff obtaining $51.2 million."   Defs. Prelim. Inj. Opp'n at 33.

Thus, because the Court could fashion a remedy (albeit not HSS's preferred remedy of an immediate award of $51.2 million) if HSS were to prevail on its claims even if the $2.9 billion carveout of PRF funds is not available for distribution, this case is not moot, and the Court may decide the cross-motions for summary judgment on the merits.

## II.   The Challenged Decisions Are Committed to Agency Discretion

Defendants argue that "Plaintiff's challenges to the Phase 3 funding mechanisms are presumptively unreviewable because they concern how the Agency distributed funds appropriated for the reimbursement of eligible healthcare providers," a matter committed to agency discretion, as "Congress appropriated a sum of funds for the Agency to use for a particular purpose and did little to cabin its discretion to develop and implement a mechanism for distributing those funds." Defs. Br. at 17–18.  HSS resists this characterization, arguing that the decisions are reviewable because the D.C. Circuit held that other challenges to CARES Act funding were reviewable in Shawnee Tribe v. Mnuchin, 984 F.3d 94 (D.C. Cir. 2021), and Prairie Band Potawatomi Nation v. Yellen, 63 F.4th 42 (D.C. Cir. 2023).  See Pl. Reply at 4–5.

"Although '[t]here is a strong presumption of reviewability under the' APA, section 701(a) 'expressly precludes judicial review of agency action "committed to agency discretion by law."'" Shawnee Tribe, 984 F.3d at 99 (quoting Steenholdt v. F.A.A., 314 F.3d 633, 638 (D.C. Cir. 2003)); see 5 U.S.C. § 701(a)(2) (excluding from judicial review agency action "committed to agency discretion by law").  "Certain agency decisions are thus 'presumed immune from judicial review.'" Shawnee Tribe, 984 F.3d at 99 (quoting Heckler v. Chaney, 470 U.S. 821, 832 (1985)).  "[E]ven if agency action is presumptively reviewable, section 701(a)(2) also applies 'in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'"  Id. (quoting Physicians for Soc. Resp. v. Wheeler, 956 F.3d 634, 642 (D.C. Cir. 2020)).  "That is, 'if

11

the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion,' then there can be no judicial review." Id. (quoting Wheeler, 956 F.3d at 642).

The relevant statutory language in the CARES Act provides little guidance on the Agency's distribution of the authorized funds.  It states that the funds shall be used "to reimburse . . . eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus" and that such payments "shall be made in consideration of the most efficient payment systems practicable to provide emergency payment."  CARES Act, 134 Stat. at 563.  While fairly barebones, the CARES Act does provide some basic guardrails: (1) the amounts reimbursed to "eligible health care providers" must be "for health care related expenses or lost revenues that are attributable to coronavirus"; (2) all appropriated funds must "remain available until expended"; (3) the Agency must, "on a rolling basis, review applications and make payments"; (4) such payments must be made "in consideration of the most efficient payment systems practicable to provide emergency payment"; (5) the appropriated funds were only to be used for certain permissible uses, such as "medical supplies and equipment"; and (6) the payments could not reimburse "expenses or losses that have been reimbursed from other sources."  Id.

The Court acknowledges that these represent constraints on the use of the appropriated funds and thus that the statute does offer some limited judicially manageable standards that preclude lack of jurisdiction based on non-reviewability, at least to the extent that a challenge relates to those particular standards.  The problem here is that none of the challenged actions relate to, let alone contravene, these basic standards.

As the Court previously noted in its Order denying the preliminary injunction, although the governing statute provides some constraints on government action, "HSS's grievances are

unrelated to the constraints imposed by the statute but rather challenge decisions over which the agency has total discretion," rendering the challenged decisions likely unreviewable. Prelim. Inj. Order at 11. The Agency's decisions in Phase 3 to create 27 provider-type categories, develop an outlier cap based on the mean-loss ratio within each of those categories, and develop a reconsideration process that only corrected errors in payment calculations cannot be reviewed because they are decisions that were implicitly committed to agency discretion based on the incredibly broad language of the statute. See Shawnee Tribe, 984 F.3d at 99. HSS does not credibly argue that any of these decisions contravened any of the constraints set forth in the CARES Act; instead, it primarily argues that the decisions were arbitrary and capricious or lacked sufficient reasoning in the administrative record. But a decision that is committed to agency discretion is immune from APA review. See 5 U.S.C. § 701(a)(2) (noting that APA applies "except to the extent that . . . agency action is committed to agency discretion by law").

Shawnee Tribe does not provide the support HSS argues it does. There, the relevant portion of the CARES Act at issue was Title V, which appropriated funds "for making payments to States, Tribal governments, and units of local government" for "necessary expenditures incurred due to the public health emergency with respect to [COVID-19]." 42 U.S.C. § 801(a)(1), (d)(1). Congress designated a subset of those funds specifically to "Tribal governments" in

> the amount the Secretary [of the Treasury] shall determine . . . that is based on increased expenditures of each such Tribal government . . . relative to aggregate expenditures in fiscal year 2019 by the Tribal government . . . and determined in such manner as the Secretary determines appropriate to ensure that all amounts available . . . for fiscal year 2020 are distributed to Tribal governments.

Id. § 801(c)(7). "Because data about increased expenditures for fiscal year 2020 were 'unknown' and could only be 'estimate[d]' at that point, the Secretary 'determined that it [was] reasonable and appropriate to allocate payments based on a formula [that] [took] into account population data,

employment data, and expenditure data.'"   Shawnee Tribe, 984 F.3d at 96–97 (first three

alterations in original).   The Secretary allocated 60% of the funds based on tribal population as a

proxy for "increased expenditures" and relied on "Tribal population data used by the Department

of Housing and Urban Development (HUD) in connection with the Indian Housing Block Grant

(IHBG) program" rather than enrollment data submitted by the tribes.   Id. at 97 (internal quotation

marks omitted).   But "[t]he IHBG data does not reflect actual tribal enrollment.   Instead, it

estimates a tribe's 'population' in a geographical 'formula area' based on population numbers

drawn from census projections of the number of individuals who consider themselves 'American

Indian or Alaska Native' on census forms."   Id.   The Shawnee Tribe was negatively impacted by

this formula because although it had 2,113 enrolled members, the IHBG data suggested it had zero

members.   Id.   It thus received the minimum payment ($100,000) despite having $6.6 million in

expenditures during the relevant period.   Id.   The Shawnee Tribe "contended that the Secretary

acted arbitrarily, capriciously, and unlawfully by using population as a proxy for increased

expenditures, selecting the IHBG population data rather than other available data, and refusing to

adjust what the Tribe deemed errors in the IHBG data."   Id. at 98.

        The D.C. Circuit held that Title V "carries no presumption of non-reviewability" because

it provided "that the 'amount paid to a Tribal government' shall be 'based on increased

expenditures . . . relative to aggregate expenditures . . . and determined in such manner as the

Secretary determines appropriate to ensure that all amounts available . . . are distributed to Tribal

governments.'"   Shawnee Tribe, 984 F.3d at 100.   It held that those specifications, which limited

the Secretary's discretion "to determine a method for allocating funds" consistent with the

statutory directive, "provide[d] . . . a 'judicially manageable standard' against 'which to judge the

Secretary's action.'"   Id. (cleaned up) (quoting Steenholdt, 314 F.3d at 638).

14

The statutory language at issue in <u>Shawnee Tribe</u> is thus far more specific than the language at issue in this case.  And, perhaps most importantly, the challenge in <u>Shawnee Tribe</u> directly related to specific statutory language that the Agency arguably contravened.  There is no such claim here.  Because the decisions HSS challenges do not relate to the statutory standards in the CARES Act governing provision of the PRF funds, "there is no law to apply," <u>Shawnee Tribe</u>, 984 F.3d at 99 (quoting <u>Wheeler</u>, 956 F.3d at 642), and the decisions are thus nonreviewable.[2]

## III.   Even If the Challenged Decisions Were Reviewable, They Would Not Be Arbitrary or Capricious

Even if the Agency's challenged decisions were reviewable, the record does not support HSS's contention that the decisions violated the APA's strictures.

### A.  Provider-Type Categories

HSS contends that the Agency's decision to create 27 provider-type categories for Phase 3 was arbitrary and capricious because (1) the Agency "failed to explain the need for Phase 3 Provider Types," (2) the "overbroad Provider Types lumped together dissimilar providers," and (3) the Agency's "stated goal of 'reducing provider confusion' does not justify these arbitrary categories."  Pl. Br. at 23–27.  Defendants, for their part, dismiss this notion, arguing that "the Record demonstrates that the Agency engaged in reasoned decision-making in its use and selection of available provider type categories."  Defs. Br. at 28.  Specifically, they assert that the Agency implemented the 27 provider types "to assist the Agency in authenticating the applicants' reported Tax Identification Numbers [("TINs")] as eligible health care providers," <u>id.</u> at 25, and that it "increased the number of options that were available from Phase 2, adjusted the options based on

---

[2] That is not to say that every challenge to an agency's funding decision under the CARES Act is nonreviewable.  One could envision, for example, a challenge to the Agency's appropriation of funds to an entity other than a health care provider as defined by the statute, or for compensating losses other than those attributable to COVID-19.  In those situations, the Court would have a standard against which to measure the agency's action.  But those are not the sorts of decisions that are challenged here.

the volume of these types in previous applications, consulted standard health care taxonomies, conferred with [Centers for Medicare & Medicaid Services ("CMS")] regarding the options, and considered how to present options that would avoid provider confusion and simplify the application experience," id. at 26–27.

The record supports that the Agency's decision to implement 27 provider-type categories in Phase 3 was neither arbitrary nor capricious, but instead was reasoned and based on legitimate rationales.  Provider-type categories "played an important role in identifying, authenticating, and verifying applicants."  Decl. of Alexandra Huttinger, Deputy Assoc. Adm'r, Provider Relief Bureau, Health Res. & Serv. Admin., Dep't of Health & Human Servs. [ECF No. 27-1] ("Huttinger Decl.") ¶ 23; see AR 374 ("Provider categories will be used to triage provider TIN authentication process.").  Provider-type information was already utilized in Phases 1 and 2, see Huttinger Decl. ¶¶ 24–33, 39–40; Defs. Br. 9–10, with 19 provider-type categories for applicant self-selection in Phase 2, AR 9–11.  The Agency wanted to revise the provider-type categories for Phase 3 "based on [the Phase 1 and 2 portals] and input from CMS."  Id. 40; see also id. 9; Huttinger Decl. ¶ 38.  It discussed potential revisions to the list of provider types in Phase 2, see AR 41–42, and developed a new list of provider types for the Phase 3 portal, id. 44.  It conferred with CMS when developing the list.  See AR 627–28.  The Agency ultimately decided that having 20 to 30 provider-type categories in Phase 3 would "reduce provider confusion" and "simplify the [Phase 3 portal] user experience."  Huttinger Decl. ¶ 37; see AR 9, 373–74.  Thus, the decision to implement 27 provider-type categories and use the categories to inform funding decisions—a departure from the way provider-type information was used in Phases 1 and 2—was not arbitrary and has ample support in the record.

HSS's complaint that the categories "grouped together dissimilar providers" who should have received "different treatment" in Phase 3 funding, Pl. Br. at 24 (internal quotation marks omitted), holds no water. As an initial matter, it is worth noting that HSS self-selected the provider category in which it was placed (Acute Care Hospital), AR 79, "tak[ing] much of the wind out of any complaint HSS has with its actual categorization," Prelim. Inj. Order at 16. Moreover, the record is replete with evidence that the agency carefully considered which provider categories to offer. See, e.g., AR 40–44, 373–74. Just because HSS does not agree with the Agency's ultimate decision does not render it arbitrary. Further, the Agency's decision to create the chosen scheme for efficiency purposes was completely within its discretion—if anything, it was suggested by the language of the authorizing statute. See CARES Act, 134 Stat. at 563 (providing that payments "shall be made in consideration of the most efficient payment systems practicable to provide emergency payment" (emphasis added)).

Last, HSS's claim that "more accurate provider type classifications were available and ignored," Pl. Br. at 26, is not persuasive. This complaint is nothing more than an attempt by HSS to substitute its judgment for that of the Agency—the record reflects that relevant agency actors thought through the decision to expand provider-type categories and ultimately settled on 27 categories. The APA does not require that the Agency make the best decision, or the decision most preferable to the plaintiff; it only requires that it make a reasoned decision, and it did that here.

Hence, the Agency's decision to implement 27 provider-type categories, and HSS's subsequent placement following self-selection in the Acute Care Hospital category, was neither arbitrary nor capricious.

### B.  Outlier Cap

HSS's primary complaint is that the Agency's decision to implement an outlier cap, which capped payments for providers whose loss ratio was more than one standard deviation higher than the mean for their provider group, was arbitrary and capricious.  HSS supports its argument with six reasons: (1) the cap "violated Congress's statutory directive to reimburse providers for lost revenues attributable to coronavirus"; (2) the Agency "offered no reasoned analysis to justify its outlier cap policy change"; (3) "the cap disparately benefited certain providers at the expense of others, like Hospital for Special Surgery, without a legitimate explanation"; (4) the Agency "failed to consider obvious alternatives to the outlier cap"; (5) the Agency "ignored evidence in the record demonstrating that the cap was not necessary to meet Phase 3's estimated budget"; and (6) "the belated justification [the Agency] gave for the outlier cap—'risk mitigation/cost containment'— falls flat because Hospital for Special Surgery's losses are undisputed and because [the Agency] had sufficient funds to reimburse providers at a fixed rate."  Pl. Br. at 27 (citation omitted).  The Agency disputes these characterizations, arguing that they are "thoroughly rebutted by the Record."  Defs. Br. at 29.

At the outset, HSS's first argument that the outlier cap "violated Congress's statutory directive to reimburse providers for lost revenues attributable to coronavirus" is incorrect.  As discussed above, the CARES Act provided little guidance on how the Agency should distribute the funds.  It is undisputed that HSS was reimbursed for lost revenue attributable to COVID-19.  No part of the CARES Act discusses the methodology to be used to distribute the funds, let alone prohibits certain methodologies.  And nothing in the statutory language mandates that providers must be reimbursed for <u>all</u> of their lost revenue attributable to COVID-19 or that all providers must be reimbursed at the same rate.  Thus, the decision to implement an outlier cap is committed to

18

agency discretion because the statute provides nothing to govern the methodology or amount of the payments.

HSS's second argument—that the Agency "offered no reasoned analysis to justify its outlier cap policy change"—is similarly unavailing.  First, as noted in the Court's previous Order, the introduction of an outlier cap in Phase 3 "is simply an agency making a different decision on a different issue [i.e., a different phase of the program], not an agency changing its position or creating a new policy, as HSS suggests."  Prelim. Inj. Order at 16 n.6 (internal quotation marks omitted).  Thus, there is no additional justification (beyond what is mandated in the APA) needed for the Agency's implementation of an outlier cap in Phase 3 when it was not used in Phases 1 and 2.

In any event, the record demonstrates valid justifications for the outlier cap.  As defendants note, "the Record shows that the outlier data quality control was one of two program integrity measures specific to the contours of the Phase 3 General Distribution."  Defs. Br. at 29.  Phase 3 was different from Phases 1 and 2 because the Agency was relying on applicants' "self-reported quarterly operating revenues and expenses from patient care" in order to determine funding decisions.  Id.; accord AR 28 (presentation on "[p]otential additional validation steps for Phase 3" noting that "Phase 3 will be the first time providers are paid based on quarterly self-reported operating revenues and expenses from patient care" and that "[o]fficial tax document[s] may not readily validate provider-reported data").  The record shows that the Agency considered different payment options for Phase 3, including whether "the percent of lost revenues and expenses paid [would] be a flat rate or vary."  AR 18.  The Agency considered different options for "[p]otential additional outlier flags for Phase 3" as "[quality-control] metrics."  Id. 48.  The Agency thought a quality-control mechanism was necessary because "self-reported quarterly data would not be

easily validated since financial information reported through tax documentation is annual and not broken out by quarter."  Huttinger Decl. ¶ 63.  Thus, "[b]ecause the Agency anticipated that it would not be able to verify provider-submitted quarterly data, it needed a way to account for variability in how providers reported quarterly information to the Agency."  Id.  Quality control was essential because "the Agency anticipated discrepancies in how much of an applicant's reported revenues and expenses were attributable to coronavirus."  Id. (citing AR 48, 292, 319, 404); see also AR 404 (noting that "[a]pplicants may have experienced financial impact not attributable to COVID-19").  The Agency also evaluated different potential "categories for this quality control analysis": "full applicant pool; by provider size; and by provider type."  Huttinger Decl. ¶ 70; see id. ¶¶ 72–75; see also AR 49–51 (analyzing "[l]ost revenues from patient care as a percent of total revenues from patient care" based on 286,803 applicants by provider type, size, and full pool).

Based on this data, the Agency considered three potential quality control mechanisms: (1) "[r]equire providers with flagged reporting to resubmit," (2) "[c]ap payment amount at an outlier threshold of reported changes in operating revenues," or (3) "pay based only on 2% patient care revenue."  AR 295; see Huttinger Decl. ¶¶ 81–107; see also AR 52.  The record supports that the Agency explored the pros and cons of each method, see AR 295, Huttinger Decl. ¶¶ 81–107, before ultimately settling on an outlier cap.  It decided that capping payment was the best option because (1) it avoided a drawn-out resubmission phase and thus "finalize[d] Phase 3 sooner"; (2) it "[r]educe[d] both provider and operational burden . . . by avoiding provider resubmissions"; and (3) "[s]imilar payment algorithms are frequently used for CMS programs."  AR 295.  The Agency also acknowledged that the one drawback of capping payments was that it "[m]ay disadvantage true outlier providers by capping the allowed payment amount."  Id.  But that was merely one

factor among many to consider, and the Agency ultimately concluded that the positives of the outlier cap outweighed that one negative.  And, as discussed above, making such a determination was within its discretion because the language of the CARES Act did not govern that particular determination but rather committed it to agency discretion.

Accordingly, HSS's third and fourth arguments that the cap was arbitrary and capricious—"the cap disparately benefited certain providers at the expense of others, like Hospital for Special Surgery, without a legitimate explanation" and "HRSA failed to consider obvious alternatives to the outlier cap"—are disproven by the record.  As discussed above, the Agency did provide a legitimate explanation for why the outlier cap was chosen despite disproportionately hurting true outliers: "this potential downside was outweighed by the benefits of the approach because of the need to finalize Phase 3 methodology, the burden other options placed on providers, and the interest in providing some additional relief to providers experiencing larger COVID-19 impacts." Huttinger Decl. ¶ 105.  And the Agency did consider alternatives to the cap, including individualized review and not employing an outlier methodology at all.  So HSS's complaint that "[t]he two obvious alternatives HRSA ignored were: (i) no outlier cap; and (ii) individualized review of outlier flags," Pl. Br. at 34, is a misstatement of the record.

HSS's attempt to compare this case to Prairie Band, 63 F.4th 42, is similarly unpersuasive. As more fully explained by the Court in its previous Order, Prairie Band is distinguishable.  The underlying facts of Prairie Band are similar to Shawnee Tribe, discussed above.  Prairie Band challenged the Secretary's distribution decision, under which "$5.3 million was allocated to Shawnee for its 3,021 enrolled members" while Prairie Band "was allocated approximately $3.3 million . . . for its 4,561 enrolled members."  Prairie Band, 63 F.4th at 47.  "Shawnee received around $2 million more with around 1,500 fewer enrolled members," resulting "in a per enrolled

member distribution of approximately $1,754 for Shawnee and approximately $724 for Prairie Band." Id. (internal quotation marks omitted).  The court remanded to the agency to explain its rationale for the disparity, noting that "[a]bsent further explanation, this 'treat[s] similar situations in dissimilar ways' contrary to the principles of reasoned decisionmaking."  Id. (quoting Garrett v. F.C.C., 513 F.2d 1056, 1060 (D.C. Cir. 1975)).

HSS claims that Prairie Band compels the same result here: "[a]s in Prairie Band, the Agency failed to explain its variable funding methodology that shortchanged providers—like Hospital for Special Surgery—who suffered large COVID-19 losses."  Pl. Br. at 33.  But this case is materially different from Prairie Band: the Prairie Band Tribe had more members but received less funding than the Shawnee Tribe, and there was no rational reason for that outcome as the implementing statute directed funds to be apportioned based on expenditures and the Secretary decided that population was an acceptable proxy for expenditures.  HSS, however, was treated differently than those providers who were not subject to the outlier cap because HSS was different—it had a much higher loss ratio.  And as discussed above, nothing in the relevant statutory language here dictated how the funds should be distributed among eligible providers or that the Agency needed to compensate all health care providers at the same rate of revenue loss.

Finally, HSS's last two arguments—that "HRSA ignored evidence in the record demonstrating that the cap was not necessary to meet Phase 3's estimated budget" and "the belated justification HRSA gave for the outlier cap . . . falls flat because . . . HRSA had sufficient funds to reimburse providers at a fixed rate"—are also belied by the record.  It is first worth noting that there were other legitimate reasons for implementing the outlier cap beyond budgetary concerns. But to the extent the cap was implemented, in part, to make sure that the appropriations stretched far enough to reimburse all eligible providers, see Huttinger Decl. ¶¶ 108–115, that is a permissible

22

and legitimate consideration.  The budget for Phase 3 was $24.5 billion.  Based on a November 9, 2020 presentation, if the Agency were to reimburse all eligible providers for 100% of their losses attributable to COVID-19, the total amount of funds paid would be $27.5 billion, $3 billion over budget.  See AR 794.  A month later, the estimate was even higher—a December 18, 2020 presentation projected that 100% reimbursement would go over budget by nearly $5 billion, as payouts were estimated at $29.1 billion at that time.  Id. 1523.  The Agency thus determined that it could only reimburse eligible providers at an 88% rate and that applying the outlier cap was estimated to save $3 billion in payments at that reimbursement rate.  Id. 1514–15.  With those two restrictions in place, the estimated total payment amount was $23.6 billion, which was within the budget.  Id. 1514.  That the Agency ultimately came in under budget and only distributed $19.5 billion in payments does not undermine the fact that, at the time it was determining the payment rates and methodology, it was concerned about being able to stay within budget and distribute funds to all eligible providers.  Hindsight is, of course, 20/20.

Hence, HSS has failed to carry its burden of showing, based on the record, that the Agency's decision to implement an outlier cap based on loss-ratio methodology was arbitrary or capricious.

### C.  Reconsideration Process

HSS also argues that the Agency's decision to implement a Phase 3 reconsideration process that only corrected payment calculation errors was arbitrary and capricious.  Pl. Br. at 39.  HSS complains that the Agency "provided no rational explanation for limiting Phase 3 Reconsideration to calculation errors" and "ignored the obvious alternative of designing a reconsideration process that allowed for waivers or exemptions."  Id. at 39–43.  Defendants disagree, arguing that the record reflects that the Agency "consider[ed] a variety of relevant factors in designing and

implementing its chosen reconsideration process" and that it had good reason for limiting reconsideration to only calculation errors.  See Defs. Br. at 35–36.

The record demonstrates that the chosen reconsideration process passes APA muster.  After receiving several inquiries from Phase 3 applicants, see AR 809–92, 957–69, 976–89, 1051–59; see also Decl. of Diana Espinosa [ECF No. 28-2] ("Espinosa Decl.") ¶¶ 14–17, the Agency decided it needed "a [formal] process to review the known cases for potential funding revision as soon as possible" because "[t]he workload these [reconsideration] cases have created, and [that] potential additional cases will create, has been extremely taxing on Customer Support as there's been no path to resolution for the providers," AR 954; see also Espinosa Decl. ¶ 19.  It accordingly decided "to stand up the reconsiderations process for PRF."  AR 954.  An Agency employee presented a "[p]roposal for [r]econsideration of [p]rovider [r]elief [f]unds," see id. 971–75, which was informed by "numerous meetings with key . . . staff" who "shar[ed] data and explain[ed] prior processes," id. 970.

The Agency ultimately determined that it would "only consider reconsideration requests from providers who believe their Phase 3 payment calculation was incorrect," and accordingly would "not consider reconsideration requests that would require a change to payment methodology or policy."  AR 1068.  It then developed a standard operating procedure for the reconsideration process, which stated that "PRF reconsideration payment determinations are guided by the Phase 3 PRF Payment Methodology."  Id. 1156; see id. 1156–66.  The revised standards issued about a year later stated the same.  See id. 1185–96.

Although the record as to the decision-making process here is somewhat opaque as compared to other aspects of the decision-making in Phase 3, the record suggests that the decision to limit Phase 3 reconsideration to payment calculation errors was due to the fact that changes to

methodology would affect the payments already administered to every other provider within a given category.  See, e.g., AR 661 (noting that "[a]ll data will first be collected before payments based on lost revenue amounts are calculated," meaning that changes to the data/methodology would necessarily affect the payment amount for everyone in a given provider category).  Thus, "changes to the methodology would have required re-calculating payments for large swaths of, or perhaps each of, the over 113,000 Phase 3 applications."  Defs. Br. at 13–14 (citing Espinosa Decl. ¶ 24, which explained the operational challenges involved in a reconsideration process that considered changes to methodology, including "[e]xtreme infeasibility," "[i]nterference with other PRF functions and payments," and "[c]ost containment/budget").  Recalculating payments based on a revised methodology would require "claw[ing] back funds, a process which would have imposed a significant burden on the Agency and providers."  Id. at 14.  There was also a related concern that recalculating payments en masse after the fact could lead to exceeding the Phase 3 budget.  See id.; see also Espinosa Decl. ¶ 24.  This rationale is sufficient to pass APA muster, as "an agency's decision [need not] be a model of analytic precision to survive a challenge," Dickson, 68 F.3d at 1404, and "[a] reviewing court will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,'" id. (quoting Bowman Transp., Inc., 419 U.S. at 286).  Although the Court has doubts as to whether this, like HSS's other grievances, can be reviewed at all, see Prelim. Inj. Order at 18, to the extent there are statutory mandates that guide HHS and the reviewing court, the Agency's considerations are squarely in line with them: the decision to limit reconsideration was done in an attempt to utilize "the most efficient payment systems practicable to provide emergency payment," CARES Act, 134 Stat. at 563.

Hence, the Court concludes that the Agency's decision to implement a Phase 3 reconsideration process that corrected only payment calculation errors was neither arbitrary nor capricious.

## Conclusion

For the foregoing reasons, the Court will deny plaintiff's motion for summary judgment and will grant defendants' cross-motion for summary judgment.  An accompanying Order will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated:  August 24, 2023